**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

| | | |
|---|---|---|
| **ENZZO ENMANUEL DE JESUS LOPEZ-AREVELO,** | § § § | |
| **Petitioner,** | § § | |
| v. | § § | **CAUSE NO. EP-25-CV-337-KC** |
| **GARRETT RIPA, et al.,** | § § § | |
| **Respondents.** | § | |

## <u>ORDER</u>

On this day, the Court considered Petitioner Enzzo Enmanuel de Jesus Lopez-Arevelo's Amended Petition for Writ of Habeas Corpus, ECF No. 20. For the following reasons, the Petition is **GRANTED IN PART**.

## I.    BACKGROUND

This case involves Lopez-Arevelo's challenge to Respondents' decision to detain him without a bond hearing after he had been released on his own recognizance for nearly three years. The following facts are derived from the verified allegations in the Amended Petition, documentary evidence submitted by the parties, and representations made by counsel during the September 8, 2025, Hearing.

### A.    Arrival in the United States & Initial Immigration Proceedings

Lopez-Arevelo is a native and citizen of Venezuela. Am. Pet. ¶ 46. There, he protested against the government of Venezuelan President Nicolas Maduro "and became the target of Maduro's security forces. This targeting forced him to give up his livelihood and flee Venezuela." *Id.* ¶ 47.

Lopez-Arevelo entered the United States near Calexico, California on August 8, 2022.[1] *Id.* ¶ 48.  He was apprehended and held in government custody until August 10.  *Id.*  On that date, he was interviewed by immigration authorities.  *Id.*  He applied for asylum and withholding of removal, and he was released from custody.  *Id.*  He was issued a Call-In Letter, ECF No. 18-3, signed by an Immigration and Customs Enforcement ("ICE") Deportation Officer.  The Call-In Letter informed Lopez-Arevelo of an appointment on August 31, 2022, in Miramar, Florida, and stated, "You have been paroled into the United States . . . ."  Call-In Letter 1.

Attached to the Call-In Letter was an Order of Release on Recognizance, which stated: "You have been arrested and placed in removal proceedings.  In accordance with section 236 of the Immigration and Nationality Act and the applicable provisions of Title 8 of the Code of Federal Regulations, you are being released on your own recognizance provided you comply with the following conditions."  *Id.* at 2.  Among other conditions, he was ordered to report for hearings and interviews as directed, to surrender for removal if ordered, and to comply with local, state, and federal law.  *Id.*

### B.    Labor Trafficking

After his release, Lopez-Arevelo moved to live near family in Miami, Florida.  Am. Pet. ¶ 11; T-Visa Application 5, ECF No. 18-1.  There, he was recruited as a laborer for Angel Storage Construction LLC and became "one of many victims" of a labor "trafficking nightmare," from September to November 2022.  Am. Pet. ¶ 49.  He was transported to jobsites in multiple states and worked more than sixty hours per week under dangerous, grueling conditions without the necessary safety equipment.  T-Visa Application 5–7.  He was frequently threatened with retaliation if he complained.  *Id.* at 7–8.  He was never paid his promised wages of $11 per hour,

---

[1] While the Amended Petition states that Petitioner "came to the port of entry," Am. Pet. ¶ 48, Petitioner's counsel represented during the September 8, 2025, Hearing that he did not enter at the port.  Minute Entry ("Sept. 8 Hr'g") 13:38:19–13:38:56, ECF No. 21.

receiving less than the legal minimum wage and only barely enough money to meet his basic needs. *Id.* at 6, 8.

In 2023, Lopez-Arevelo was one of several plaintiffs in a lawsuit against Angel Storage, which resulted in a default judgment in the plaintiffs' favor on trafficking and wage and hour claims. Am. Pet. ¶ 50. Meanwhile, Lopez-Arevelo reported Angel Storage to Homeland Security Investigations ("HSI") for labor trafficking, though HSI declined to prosecute. *Id.* ¶ 51. Lopez-Arevelo also reported Angel Storage for labor trafficking to the Maryland Office of the Attorney General ("Maryland OAG"). *Id.* ¶ 52. The Maryland OAG "believes [Lopez-Arevelo] to be a valuable witness of this trafficking as they investigate and prosecute" Angel Storage. *Id.* For that reason, the Maryland OAG applied for "Continued Presence" for Lopez-Arevelo. Sept. 4, 2025, Email, ECF No. 18-2. That application "was approved by the DHS Center for Countering Human Trafficking for the period from 08/27/2025 to 08/26/2027." *Id.*; Am. Pet. ¶ 67.

On August 7, 2025, Lopez-Arevelo submitted an application for a T nonimmigrant visa, which confers legal status to victims of trafficking. Am. Pet. ¶ 53. Previously, in February 2025, he also applied for—and was ultimately granted—authorization to work in the United States, due to his pending asylum claim. Reply Ex. 4 ("Employment Authorization Approval Notice"), ECF No. 18-4.

### C.    2025 Immigration Proceedings, Arrest, and Detention

On August 8, he appeared for a hearing in connection with removal proceedings at the Miami Immigration Court. Am. Pet.¶¶ 54–55. At the hearing, the Department of Homeland Security ("DHS") moved to dismiss the proceedings under 8 C.F.R. § 1239.2(c). Resp. Ex. B ("IJ MTD Order") 1, ECF No. 14-2. The Immigration Judge ("IJ") granted DHS's motion over

Lopez-Arevelo's objection. *Id.* at 2. Lopez-Arevelo appealed that decision to the Board of

Immigration Appeals ("BIA"), and his appeal remains pending. Am. Pet. ¶ 82; Minute Entry

("Sept. 8 Hr'g") 13:22:53–13:23:08,[2] ECF No. 21.

     In the lobby of the Immigration Court, ICE agents arrested Lopez-Arevelo. Am. Pet.

¶ 56. He was detained for five days at the "Alligator Alcatraz" detention facility, before being

sent to El Paso, Texas. *Id.* ¶¶ 57–58. In El Paso, it appears that Lopez-Arevelo was transferred

among several different detention facilities and is currently confined at Camp East Montana on

the Fort Bliss United States Army post. *Id.* ¶ 1.

     On or about August 21, ICE agents told Lopez-Arevelo that he had to sign "deportation

papers," and that if he did not do so, he would be deported to Mexico. *Id.* ¶ 59. Lopez-Arevelo

signed the "deportation papers." *Id.* Those papers were a Notice and Order of Expedited

Removal ("ER Order"), ECF No. 18-5. The ER Order charges Lopez Arevelo with

inadmissibility to the United States under section 212(a)(7)(A)(i)(I) of the Immigration and

Nationality Act ("INA"), which reads:

> Except as otherwise specifically provided in this chapter, any immigrant at the
> time of application for admission . . . who is not in possession of a valid
> unexpired immigrant visa, reentry permit, border crossing identification card, or
> other valid entry document required by this chapter, and a valid unexpired
> passport, or other suitable travel document, or document of identity and
> nationality if such document is required under the regulations issued by the
> Attorney General under section 1181(a) of this title . . . is inadmissible.

8 U.S.C. 1182(a)(7)(A)(i)(I).

     The ER Order also recites that Lopez-Arevelo is a citizen of Venezuela who entered the

country on August 8, 2022, and was "not then admitted or paroled after inspection by an

Immigration Officer." ER Order 4. It goes on to find Lopez-Arevelo "inadmissible as charged

---

[2] The timestamps correspond to the local time of day in El Paso, Texas, on September 8, 2025, the day of
the Hearing.

and ordered removed from the United States." *Id.* Lopez-Arevelo signed the bottom of the document, dated August 21, 2025. *Id.*

On September 4, 2025, the IJ held a bond review hearing in connection with the removal proceedings that were dismissed on August 8 and remain on appeal at the BIA. Am. Pet. ¶ 65. DHS attorneys filed the ER Order on the immigration court's docket. *Id.* According to Lopez-Arevelo, the IJ stated that the immigration court lacked jurisdiction to adjudicate Lopez-Arevelo's detention status because he was undergoing expedited removal proceedings and there was no warrant for his detention. *Id.* The IJ's written decision contains little explanation but notes that the "request for a change in custody status" was denied for "[n]o jurisdiction." Reply Ex. 6 ("IJ Bond Order"), ECF No. 18-6. Lopez-Arevelo has appealed that decision to the BIA as well. Sept. 8 Hr'g 14:17:10–14:17:18.

### D.    Procedural History

The day after receiving the ER Order, on August 22, Lopez-Arevelo filed this habeas case, represented by counsel. Verified Pet. Writ Habeas Corpus & Req. Emergency TRO, ECF No. 1. He also sought a temporary restraining order ("TRO") to prevent his transfer from the Western District of Texas or removal from the United States during the pendency of this litigation, which the Court granted on August 26. Order Granting TRO, ECF No. 11. On September 8, the Court held a hearing, at which Lopez-Arevelo, his attorneys, and Respondents' counsel were present. At the conclusion of the hearing, the Court granted Lopez-Arevelo leave to amend his Petition and extended the TRO through September 22, 2025. Sept. 8, 2025, Oral Order; Sept. 8, 2025, Order, ECF No. 22.

In addition to the Petition and Amended Petition, the Court has received Respondents' Response, ECF No. 14, and Lopez-Arevelo's Reply, ECF No. 18.

## II.    DISCUSSION

Lopez-Arevelo seeks a writ of habeas corpus for his immediate release from custody, arguing that Respondents are violating his right to procedural due process by continuing to detain him.  *See* Am. Pet. 21 & ¶¶ 68–82.  Respondents make four arguments in opposition: (1) the Court lacks subject matter jurisdiction to adjudicate Lopez-Arevelo's custody; (2) Lopez-Arevelo failed to name the correct custodian as a respondent; (3) Lopez-Arevelo's claim is premature for failure to exhaust administrative remedies; and (4) Lopez-Arevelo's procedural due process rights have not been violated.  Resp. 5–10.

### A.    Subject Matter Jurisdiction

Because it concerns the Court's power to decide the case, "[j]urisdiction is always first." *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 466 (5th Cir. 2024) (quoting *Arulnanthy v. Garland*, 17 F.4th 586, 592 (5th Cir. 2021)); *see also United States v. Willis*, 76 F.4th 467, 479 (5th Cir. 2023) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)). "'Federal courts are courts of limited jurisdiction,' possessing 'only that power authorized by Constitution and statute.'"  *Gunn v. Minton*, 568 U.S. 251, 256 (2013) (citation omitted).  And several sections of the INA curtail the jurisdiction of federal district courts in immigration cases. *See Jennings v. Rodriguez*, 583 U.S. 281, 292–96 (2018).

Respondents appeal to three such jurisdiction-stripping provisions here: 8 U.S.C. § 1252(a)(5), § 1252(g), and § 1226(e).  Resp. 7–8.  All three eliminate or severely limit the jurisdiction of federal district courts to consider habeas petitions filed by people in immigration detention.  But each provision is triggered by challenges to different agency decisions.  Section 1252(a)(5) concerns only challenges to "an order of removal."  For its part, § 1252(g) applies to "any cause or claim by or on behalf of any alien arising from the decision or action by the

Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien . . . ."  Finally, § 1226(e) relates to actions impugning "[t]he Attorney General's discretionary judgment regarding the application of [§ 1226]," as well as "any action or decision by the Attorney General under [§ 1226] regarding the detention of any alien or the revocation or denial of bond or parole."

> **1.      Section 1252(a)(5)**

Section 1252(a)(5) is a narrowly applicable provision, which "specifies that the only means of obtaining judicial review of a final order of removal, deportation, or exclusion is by filing a petition with a federal court of appeals."  *Duarte v. Mayorkas*, 27 F.4th 1044, 1051 (5th Cir. 2022).  It is a "zipper clause," *id.* at 1056 (quoting *Duron v. Johnson*, 898 F.3d 644, 647 (5th Cir. 2018)), which "funnel[s] judicial review of final deportation orders . . . into a single mechanism," *id.*  Thus, where there is no final removal order and a habeas petitioner's "arrest and detention claims are independent of any future removal order," § 1252(a)(5) does not prevent the district court from hearing such claims.  *Medina v. U.S. Dep't Homeland Security*, No. 17-cv-218, 2017 WL 2954719, at *15 (W.D. Wash. Mar. 14, 2017); *accord Jennings*, 583 U.S. at 320 (Thomas, J., concurring) (describing § 1252(a)(5)'s narrow applicability to support a broader reading of a separate jurisdiction-channeling provision, § 1252(b)(9)).[3]

Whether Lopez-Arevelo is subject to a final order of removal was, until the September 8 Hearing, uncertain.  Indeed, as recently as September 4, the IJ apparently determined that it lacked jurisdiction to redetermine Lopez-Arevelo's custody status based on its review of the August 21 ER Order.  Am. Pet. ¶ 65.  And on its face, the ER Order certainly appears to be a

---

[3] Respondents do not mention § 1252(b)(9) or argue that it applies here.  *See generally* Resp.

final order of removal—it directs that Lopez-Arevelo is "ordered removed from the United States." ER Order 4.

But at the September 8 Hearing, Respondents' counsel represented to the Court that Lopez-Arevelo is "not currently facing removal under expedited removal, absolutely not." Sept. 8 Hr'g 14:10:10–14:10:18. According to Respondents, the ER Order was filed in the immigration court ahead of the bond hearing "not for the basis of showing that he was subject to an expedited removal order, but for the basis of showing that he was an applicant for admission because it has the . . . removal charge saying you're an applicant for admission." *Id.* 13:58:25–13:58:41. Respondents do not appear to dispute that DHS secured the dismissal of full removal proceedings against Lopez-Arevelo on August 8 in order to arrest him and place him into expedited removal proceedings. Their position is that "upon further review and noticing that he did file an appeal of that dismissal order, [Enforcement and Removal Operations ("ERO")] has walked back any intent to try to execute his removal order under the expedited removal statute." *Id.* 13:27:27–13:27:41.

During the Hearing, the Court asked what assurance Lopez-Arevelo had that the paperwork in his file—which purports to order his removal on an expedited basis—would not be acted on. *Id.* 13:27:41–13:27:50. Respondents' counsel stated that she "[did not] have an answer to that," and then that Respondents "would request that there be an order to . . . withdraw that August 8, 2025, I 860."[4]  13:28:18–13:28:40. On the basis of these representations, the Court finds that Respondents have withdrawn the August 8, 2025, ER Order. Thus, there is no extant final order of removal against Lopez-Arevelo, and § 1252(a)(5) poses no jurisdictional bar. *See Duarte*, 27 F.4th at 1051, 1056.

---

[4] I-860 is the form number for a Notice and Order of Expedited Removal. *See, e.g.*, ER Order 1.

## 2.    Section 1252(g)

Respondents also argue that the Court lacks jurisdiction under § 1252(g).  Resp. 7.  On its face, § 1252(g) prohibits federal district courts from considering "any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter." But the Supreme Court has "not interpret[ed] this language to sweep in any claim that can technically be said to 'arise from' the three listed actions of the Attorney General.  Instead, [the Court has] read the language to refer to just those three specific actions themselves." *Jennings*, 583 U.S. at 294 (citing *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 482–83 (1999)).  Thus, § 1252(g) applies only "to protect from judicial intervention the Attorney General's long-established discretion to decide whether and when to prosecute or adjudicate removal proceedings or to execute removal orders."  *Duarte*, 27 F.4th at 1055 (quoting *Alvidres-Reyes v. Reno*, 180 F.3d 199, 201 (5th Cir. 1999)).  The statute "does not bar courts from reviewing an alien detention order, because such an order, 'while intimately related to efforts to deport, is not itself a decision to "execute removal orders" and thus does not implicate section 1252(g).'"  *Cardoso v. Reno*, 216 F.3d 512, 516–17 (5th Cir. 2000) (citation omitted); *accord Kong v. United States*, 62 F.4th 608, 617–18 (1st Cir. 2023) (collecting cases).

Here, Lopez-Arevelo is not challenging Respondents' decision to execute a removal order—as discussed, there is currently no removal order to execute.  Nor is Lopez-Arevelo challenging Respondents' decision to commence or adjudicate his removal proceedings.  Quite the opposite—Lopez-Arevelo has appealed the IJ's decision dismissing his removal proceedings to the BIA, and it remains for the agency to decide that appeal.  Here, instead, he challenges his

ongoing detention. Such claims are not barred by § 1252(g). *See, e.g.*, *Lopez Santos v. Noem*, No. 25-cv-1193, 2025 WL 2642278, at *2–3 (W.D. La. Sept. 11, 2025).

### 3.     Section 1226(e)

Respondents' final jurisdictional appeal is to § 1226(e). Resp. 7. Unlike the § 1252 subsections, this provision relates to claims brought by people challenging their immigration detention. "The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole." 8 U.S.C. § 1226(e). Because this section shields only the Attorney General's discretionary detention decisions, it "does not preclude 'challenges to the statutory framework that permits the alien's detention without bail.'" *Jennings*, 583 U.S. at 295 (cleaned up) (quoting *Demore v. Kim*, 538 U.S. 510, 516 (2003)); *see also Zadvydas v. Davis*, 533 U.S. 678, 688 (2001). In other words, the Court "retain[s] jurisdiction to review [a noncitizen's] detention insofar as that detention presents constitutional issues, such as those raised in a habeas petition." *Oyelude v. Chertoff*, 125 F. App'x 543, 546 (5th Cir. 2005); *accord Maldonado v. Macias*, 150 F. Supp. 3d 788, 794 (W.D. Tex. 2015) (citing *Baez v. Bureau of Imm. & Customs Enf't*, 150 F. App'x 311, 312 (5th Cir. 2005)).

Lopez-Arevelo claims that Respondents' decision to detain him indefinitely without a bond hearing violates his right to procedural due process. Am. Pet. ¶¶ 70, 76, 79, 82. The IJ refused to make any individualized determination of whether to detain him, citing lack of jurisdiction. IJ Bond Order 1. This is unlike a case in which a bond hearing was held, an individualized assessment was made regarding the appropriateness of detaining a noncitizen, and, in the IJ's discretion, they were denied bail. In such circumstances, the Court would likely

lack jurisdiction to consider a collateral attack on that denial.  *See, e.g.*, *Diaz Ortiz v. Smith*, 384 F. Supp. 3d 140, 144 (D. Mass. 2019) ("Ultimately, Diaz Ortiz disagrees with the immigration judge's weighing of the evidence and exercise of discretion with respect to dangerousness.  The Court does not have jurisdiction to hear such a challenge.").  Because Lopez-Arevelo instead argues that his "detention without an individualized bond hearing violated [his] Fifth Amendment rights," the Court has subject-matter jurisdiction to consider the merits of that constitutional claim.  *See Diallo v. Pitts*, No. 19-cv-216, 2020 WL 714274, at *5 (S.D. Tex. Jan. 15, 2020), *report and recommendation adopted*, 2020 WL 709326 (Feb. 12, 2020).

In sum, none of Respondents' jurisdictional arguments are availing.

## B.      Custodian

Respondents next argue that dismissal is warranted because Lopez-Arevelo failed to name his immediate custodian as a respondent.  Resp. 5–6.  For immigration habeas petitions, "jurisdiction lies in only one district: the district of confinement."  *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025) (quoting *Rumsfeld v. Padilla*, 542 U.S. 426, 443 (2004)).  And "the immediate custodian, not a supervisory official who exercises legal control, is the proper respondent." *Aguilar v. Johnson*, No. 25-cv-1904, 2025 WL 2099201, at *1 (N.D. Tex. July 25, 2025) (quoting *Padilla*, 542 U.S. at 442–43).  "For a person being detained in connection with an immigration matter, the immediate custodian is the warden of the detention center."  *Id.* at *2 (quoting *Khalil v. Joyce*, 777 F. Supp. 3d 369, 396 (D.N.J. 2025)).

Lopez-Arevelo concedes that in his original Petition, he did not name an immediate custodian in El Paso as a respondent.  Reply 17.  Uncertain at which El Paso facility Lopez-Arevelo was detained and facing "a lack of public data" regarding the identity of potential custodians, Lopez-Arevelo's attorneys simply named the custodian who had detained him in

Florida.  *Id.*  They have since filed an Amended Petition, naming, among others, Marisa Flores, the Director of the El Paso Field Office for ICE/ERO.  *Id.*; Am. Pet. ¶ 12.  Respondents did not oppose Lopez-Arevelo's request to amend the Petition, even after his attorneys stated during the Hearing that they did so in part because they "had to change the custodian."  Sept. 8 Hr'g 14:28:03–14:28:14.  And Respondents have not re-urged their improper custodian arguments following amendment.

Because Lopez-Arevelo's immediate custodian in El Paso is now a Respondent, and because Lopez-Arevelo has been detained in El Paso at all times since the Petition was filed, the initial naming of an improper custodian is not grounds for dismissal.  *See, e.g.*, *Khalil*, 777 F. Supp. 3d at 404 & n.32, 410.

### C.     Administrative Exhaustion

Respondents next argue that Lopez-Arevelo's claim is premature because he has not exhausted his administrative remedies.  Resp. 6–7.  "Under the INA exhaustion of administrative remedies is only required by Congress for appeals on final orders of removal."  *Garza-Garcia v. Moore*, 539 F. Supp. 2d 899, 904 (S.D. Tex. 2007); *see* 8 U.S.C. § 1252(d)(1) ("A court may review a final order of removal only if . . . the alien has exhausted all administrative remedies.").

Respondents reference two cases in support of their contrary position.  *See* Resp. 6–7 (first citing *Hinojosa v. Horn*, 896 F.3d 305, 314 (5th Cir. 2018); and then citing *Petgrave v. Aleman*, 529 F. Supp. 3d 665, 672 n.14 (S.D. Tex. 2021)).  But *Hinojosa* involved petitioners who challenged the denials of their applications for passports at ports of entry on the grounds that they were not U.S. citizens.  896 F.3d at 309.  The statute on which the *Hinojosa* court relied to require administrative exhaustion provides a system of review specific to applicants for admission who "claim[] a right or privilege as a national of the United States."  8 U.S.C.

§ 1503(b); *Hinojosa*, 896 F.3d at 314–15.  Lopez-Arevelo has made no such claim, so *Hinojosa* is entirely inapt.

Petgrave, however, involved far more comparable circumstances.  There, the petitioner was a foreign national who was detained after surreptitiously entering the country.  529 F. Supp. 3d at 666, 668–69.  He challenged "the constitutionality of his continued detention without a bond hearing pending the outcome of his asylum case under the Fifth Amendment's Due Process Clause."  *Id.* at 669.  The court found that it was not barred by principles of administrative exhaustion from considering the petition, for two reasons.  *Id.* at 672 n.14.  First, because his "filings raise[d] constitutional questions that 'neither [an] [IJ] nor th[e] [BIA] may rule on.'"  *Id.* (citation omitted).  And second, because he had appealed the IJ's bond denial to the BIA and "the appeal timeline exacerbate[d]" his alleged injury of prolonged detention.  *Id.*

These reasons apply here with equal or greater force.  As in *Petgrave*, Lopez-Arevelo challenges his ongoing detention as a violation of due process.  *See id.*  He requested a bond hearing before an IJ, who determined that he lacked jurisdiction to hold one.  IJ Bond Order. And he has appealed that decision.  Sept. 8 Hr'g 14:17:10–14:17:18.  Requiring him to wait, indefinitely, for a ruling on that appeal would be inappropriate because it would exacerbate his alleged constitutional injury—detention without a bond hearing.  *See Petgrave*, 529 F. Supp. 3d at 672 n.14.  "Bond denial appeals 'typically take six months or more to be resolved at the BIA.'"  *Pizarro Reyes v. Raycraft*, No. 25-cv-12546, 2025 WL 2609425, at *3 (E.D. Mich. Sept. 9, 2025) (quoting *Rodriguez v. Bostock*, 779 F. Supp. 3d 1239, 1245 (W.D. Wash. 2025)).  "The prevention of six months or more of unlawful detention thus outweighs the interests the BIA might have in resolving" Lopez-Arevelo's appeal of the IJ's bond dismissal.  *See id.*

13

Accordingly, Lopez-Arevelo's claim is properly before the Court with no further requirement to exhaust administrative remedies.

### D.    Procedural Due Process

Turning to the merits, Respondents argue that Lopez-Arevelo "has no colorable claim" because he has been given "the constitutional minima of due process."  Resp. 9.  At the Hearing, Respondents expanded and clarified their argument.  Their position is that because Lopez-Arevelo was initially apprehended shortly after entering the country in 2022, he is subject to mandatory detention under 8 U.S.C. § 1225(b).[5] Sept. 8 Hr'g 13:22:40–13:22:51.  They argue that the INA requires them to detain Lopez-Arevelo without a bond hearing even though he was released on his own recognizance and lived and worked in the United States for three years; and even though he has been granted continued presence.  *Id.* 13:22:20–13:23:16.  Respondents reference a September 5, 2025, BIA decision that supports their position and acknowledge that it represents a departure from the way that the agency has interpreted the law since 1996. *Id.* 13:34:55–13:35:04 (citing *In re: Yajure Hurtado*, 29 I&N Dec. 216 (BIA 2025)); *id.* 14:02:57–14:03:23 ("[T]his is confusing everyone right now . . . admittedly because DHS . . . since 1996 has interpreted that people like Mr. Lopez[-Arevelo] in this situation, if they are placed into full removal proceedings, despite the fact that they are applicants for admission—for the past thirty years, DHS has allowed them to get a bond.").

In recent weeks, courts across the country have held that this new, expansive interpretation of mandatory detention under the INA is either incorrect or likely incorrect.[6] *See*

---

[5] That subsection is entitled, "Inspection of applicants for admission."  8 U.S.C. § 1225(b).  It generally provides that people encountered at or near the border and deemed inadmissible "shall be detained pending a final determination of credible fear of persecution and, if found not to have such a fear, until removed."  *Id.* § 1225(b)(1)(B)(iii)(IV).

[6] Many of these decisions have been made in the context of requests for preliminary injunctive relief.

*Lopez-Campos v. Raycraft*, --- F. Supp. 3d ----, 2025 WL 2496379, at *8 n.5 (E.D. Mich. Aug. 29, 2025) (collecting twelve such decisions); *see, e.g.*, *Jimenez v. FCI Berlin, Warden*, --- F. Supp. 3d ----, 2025 WL 2639390, at *10 & n.9 (D.N.H. Sept. 8, 2025). That includes courts in the Fifth Circuit. *Lopez Santos*, 2025 WL 2642278, at *5; *Kostak v. Trump*, No. 25-cv-1093, 2025 WL 2472136, at *3 (W.D. La. Aug. 27, 2025). Regardless, Lopez-Arevelo challenges his ongoing detention on constitutional grounds, as a violation of due process—not on statutory interpretation grounds, such as through a claim under the Administrative Procedure Act. Am. Pet. ¶¶ 68–79. Therefore, the Court need not consider whether the agency's new mandatory detention policies reflect a proper reading of the INA. The issue, instead, is whether those policies have been applied to Lopez-Arevelo in an unconstitutional manner. *See, e.g.*, *Perez v. Kramer*, No. 25-cv-3179, 2025 WL 2624387, at *3 (D. Neb. Sept. 11, 2025) (declining to consider "the validity of the government's argument that [the p]etitioner should be mandatorily detained under § 1225" or the applicability of *Yajure Hurtado* and considering, instead, the due process question).

### 1. The Effect of *Thuraissigiam*

In that vein, Respondents argued at the Hearing that, as a noncitizen who was initially apprehended shortly after entering the country illegally, Lopez-Arevelo is entitled to no more due process than the statute gives him. Sept. 8 Hr'g 14:13:00–14:15:08 (citing *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103 (2020)) ("There are procedural due process protections built into it."). In *Thuraissigiam*, the Supreme Court rejected a noncitizen's due process claim, explaining that people detained at or near the border are treated as "applicants for admission" and are afforded "only those rights regarding admission that Congress has provided by statute." 591 U.S. at 140. Although *Thuraissigiam* certainly limited the scope of due process

claims available to "applicants for admission," the decision's sweeping statements must be read in context.  *See id.*

The noncitizen in *Thuraissigiam* was detained under § 1225, and an asylum officer determined that he did not sufficiently establish a credible fear, so he was placed in expedited removal proceedings.  *Id.* at 140.  He attempted to challenge this negative credible fear determination through a writ of habeas corpus, in which he requested a "new opportunity to apply for asylum and other applicable forms of relief."  *Id.* at 114–15.

### a.    Deportability vs. Detention

This description reveals two key points of distinction between *Thuraissigiam* and Lopez-Arevelo's case.  First, Thuraissigiam challenged the denial of his asylum claim, whereas Lopez-Arevelo challenges his detention in immigration custody.  *See id.*  The Court centered its analysis on the scope of habeas relief, which permits challenges to unlawful detention, but cannot provide another "opportunity to remain lawfully in the United States."  *Id.* at 117–20.  For purposes of his application for admission, Thuraissigiam had already received his due process through the credible fear interview and was subject to immediate removal and deportation thereafter.  It was in this context that the Court determined that "an alien in [his] position has only those rights *regarding admission* that Congress has provided by statute."  *Id.* at 140 (emphasis added).  The Court did not address whether noncitizens mandatorily detained under § 1225(b) have a constitutional due process right to challenge the fact or length of their detention, as Lopez-Arevelo does here.

This reading is bolstered by another contemporaneous Supreme Court decision.  In *Jennings*, the Court held the mandatory detention statutes, § 1225(b) and § 1226(a), did not impose a six-month detention limitation, nor did the statutes require periodic bond hearings.  583

U.S. at 297–301, 312.  That is, at least as a matter of statutory construction.  *See id.*  But the Court expressly left open the constitutional due process question and remanded the case with instructions that the lower courts consider the constitutional issue in the first instance.  *Id.* at 312 ("Consistent with our role as 'a court of review, not of first view'" "we do not reach" "respondents' constitutional arguments on their merits.") (citations omitted).  Four years later, attorneys for the Government conceded before the Supreme Court "that as-applied constitutional challenges remain available to address 'exceptional' cases" in the context of immigration detention.  *Johnson v. Arteaga-Martinez*, 596 U.S. 573, 583 (2022).  And the Court again declined to consider the constitutional questions, electing to "leave them for the lower courts to consider in the first instance."  *Id.* (citing *Jennings*, 583 U.S. at 312).

Just this year, *Thuraissigiam* notwithstanding, the Supreme Court reaffirmed in broad terms that "'[i]t is well established that the Fifth Amendment entitles aliens to due process of law' in the context of removal proceedings."  *J.G.G.*, 604 U.S. at 673 (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)).  Thus, the Supreme Court has not addressed the viability of constitutional due process challenges to mandatory immigration detention—even for those who, like Lopez-Arevelo, are initially detained at or near the border as applicants for admission.

The importance of the deportability-detention distinction is underscored by a series of post-*Thuraissigiam* circuit-court decisions.  At least five circuit courts have all since considered due process challenges to unreasonably prolonged mandatory detention under § 1226, and, tellingly, none of them referenced *Thuraissigiam* in their majority opinions.  *See Banyee v. Garland*, 115 F.4th 928, 933 (8th Cir. 2024); *Black v. Decker*, 103 F.4th 133, 138 (2d Cir. 2024); *Wekesa v. U.S. Att'y*, No. 22-10260, 2022 WL 17175818, at *1 (5th Cir. Nov. 22, 2022);

*Hernandez-Lara v. Lyons*, 10 F.4th 19, 39 (1st Cir. 2021);[7] *German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 208 (3d Cir. 2020). Instead, they all referenced *Jennings*. *Banyee*, 115 F.4th at 930; *Black*, 103 F.4th at 140–46; *Wekesa*, 2022 WL 17175818, at *1; *Hernandez-Lara*, 10 F.4th at 27; *German Santos*, 965 F.3d at 208–10. That is, they all cited the detention case—not the deportability case—when considering the viability of a due process challenge to immigration detention. None support Respondents' proposition that *Thuraissigiam* applies in the detention context.

While the Eighth Circuit nonetheless held that "[d]ue process imposes no time limit on detention pending deportation," *Banyee*, 115 F.4th at 930, the First, Second and Third Circuits applied thoughtful balancing tests for determining when mandatory detention may become unconstitutionally prolonged. *Black*, 103 F.4th at 149–51; *Hernandez-Lara*, 10 F.4th at 27; *German Santos*, 965 F.3d at 210–11. For its part, the Fifth Circuit, in a divided panel opinion, found that "the district court did not err by denying Wekesa's § 2241 petition" because he failed to "meet the statutory requirements for release under Section 1226(c)(2)." 2022 WL 17175818, at *1. Although the court fleetingly noted that Wekesa raised a due process challenge, it did not address that argument or the facts underlying the case in its brief order, and neither did the district court. *Id.* at *2 n.1. Judge Dennis dissented and noted that the Supreme Court's decision in *Jennings* expressly left open the question of whether the Constitution entitles immigration detainees to some additional process, such as a bond hearing, in certain circumstances. *Id.* In his view, "prolonged detention without a bond hearing implicates due process protections and must be analyzed further" because the Fifth Amendment protects "citizens and non-citizens alike." *Id.* at *2 (citations omitted).

---

[7] Only in *Hernandez-Lara* was *Thuraissigiam* mentioned once by the dissenting judge. 10 F.4th at 57 (Lynch, J., dissenting).

Because *Wekesa* is an unpublished opinion, it has no binding precedential value, and the Court considers it only to the extent it is persuasive on the force of its own reasoning. 5th Cir. L.R. 47.5; *see, e.g.*, *Pena v. Atascosa Cnty.*, No. 5:24-cv-199-JKP, 2025 WL 310144, at *9 n. 5 (W.D. Tex. Jan. 27, 2025) (declining to follow a Fifth Circuit decision because "an unpublished opinion . . . has no precedential value."). The Court does not find the *Wekesa* opinion persuasive because it did not discuss the due process issue at all or provide sufficient facts from which the Court could discern the reasons for which it rejected the due process claim. On the other hand, the Court finds Judge Dennis' dissent persuasive, especially in light of other persuasive authority from out of circuit. *See German Santos*, 965 F.3d at 210–11.

More fundamentally, *Wekesa* is inapposite because it involved a due process challenge to prolonged, mandatory detention under § 1226. Here, however, Lopez-Arevelo challenges the decision to subject him to mandatory detention under § 1225(b) at all, without any process or individualized reasons, after he spent three years released on his own recognizance. These significant differences highlight the difficulty in applying *Wekesa*, with its scant analysis, here. And even *Wekesa* did not purport to read *Thuraissigiam* to entirely foreclose due process challenges in the mandatory detention context, as Respondents would have the Court do.

Other courts have rejected such arguments for similar reasons. *See, e.g.*, *Espinoza v. Kaiser*, No. 25-cv-1101, 2025 WL 2581185, at *7 n.9 (E.D. Cal. Sept. 5, 2025) (citation omitted). For example, in one case, ICE "ask[ed] the Court to extract from *Thuraissigiam* a broad rule that any inadmissible noncitizen possesses only those due process rights afforded to them by statute, regardless of the nature of their status or the relief they seek." *See Padilla v. U.S. Immigr. & Customs Enf't*, 704 F. Supp. 3d 1163, 1171 (W.D. Wash. 2023). But *Thuraissigiam* "constrain[ed] itself to determining only whether those challenging the admission

19

process have due process rights." *Id.* at 1172. Therefore, it did "not foreclose [the p]laintiff's due process claims which seek to vindicate a right to a bond hearing with certain procedural protections." *Id.* at 1172. So too here.

### b.    Significant Presence in the Country

A second key point of distinction is that Thuraissigiam was stopped by Border Patrol "within twenty-five yards of the border," immediately detained, and never released. *Thuraissigiam*, 591 U.S. at 114. Lopez-Arevelo, too, was initially detained shortly after entering the country on August 8, 2022, but unlike Thuraissigiam, he was released on his own recognizance two days later. Am. Pet. ¶ 48. Then, for three years, until his August 8, 2025, arrest in the immigration court lobby, he lived and worked in the United States. *See id.* ¶¶ 11, 49, 56. While Thuraissigiam saw little of this country beyond his jail cell at the border, Lopez-Arevelo has built a life here.

At the heart of *Thuraissigiam* was the notion that "an alien at the threshold of initial entry cannot claim any greater rights under the Due Process Clause" than those set by Congress. 591 U.S. at 107 (citing *Nishimura Ekiu v. United States*, 142 U.S. 651, 660 (1892)). "Th[is] distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." *Zadvydas*, 533 U.S. at 693. And the distinction is one of place—not status: "[O]ur immigration laws have long made a distinction between those aliens who have come to our shores seeking admission . . . and those who are within the United States after an entry, irrespective of its legality." *Martinez v. Hyde*, --- F. Supp. 3d ----, 2025 WL 2084238, at *8 (D. Mass. July 24, 2025) (quoting *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958)). "'In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely "on the threshold of

initial entry."'" *Id.* (quoting *Leng May Ma*, 357 U.S. at 187).  For someone like Lopez-Arevelo,

who was detained "more than a year"—indeed, three years—"after [his] initial encounter" at the

border, "it cannot be denied that [he] was 'already in the country.'"  *See id.* (quoting *Jennings*,

583 U.S. at 289).

     In sum, *Thuraissigiam* does not prohibit Lopez-Arevelo from pursuing his due process

claim, for two reasons.  First, because he challenges his detention, not his deportability.  And

second, because he was detained after years of presence in the United States, rather than on the

threshold of initial entry.

### 2.    The *Mathews* Test

     Turning, then, to the merits of Lopez-Arevelo's procedural due process challenge, "[t]o

determine whether a civil detention violates a detainee's due process rights, courts apply the

three-part test set forth in *Mathews v. Eldridge*, 424 U.S. 319 (1976)."  *Martinez v. Noem*, No.

5:25-cv-1007-JKP, 2025 WL 2598379, at *2 (W.D. Tex. Sept. 8, 2025).  Those factors are: (1)

"the private interest that will be affected by the official action"; (2) "the risk of an erroneous

deprivation of such interest through the procedures used, and the probable value, if any, of

additional or substitute procedural safeguards"; and (3) "the Government's interest, including the

function involved and the fiscal and administrative burdens that the additional or substitute

procedural requirement would entail."  *Mathews*, 424 U.S. at 335.  "The essence of procedural

due process is that a person risking a serious loss be given notice and an opportunity to be heard

in a meaningful manner and at a meaningful time."  *M.S.L. v. Bostock*, No. 25-cv-1204, 2025

WL 2430267, at *8 (D. Or. Aug. 21, 2025) (citing *Mathews*, 424 U.S. at 348).

### a.    Private Interest

As to the first element, "'[t]he interest in being free from physical detention' is 'the most elemental of liberty interests.'"  *Martinez v. Noem*, 2025 WL 2598379, at *2 (quoting *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)).  Respondents' position appears to be that, because he is subject to mandatory detention under the new interpretation of § 1225(b) adopted by the BIA in *Yajure Hurtado*, Lopez-Arevelo has no cognizable interest in his liberty.  Sept. 8 Hr'g 13:34:55–13:35:04.  For purposes of this analysis, the Court can assume without finding that Respondents' interpretation of the law is permissible, and that people who are arrested near the border must be subjected to mandatory detention, going forward.  But, as other courts have noted in considering this issue, "Respondents fail to contend with the liberty interests created by the fact that the Petitioner[] in this case [was] released on recognizance *prior to the manifestation of this interpretation*."[8]  *Espinoza*, 2025 WL 2581185, at *10.

This position finds support in the longstanding principle in the criminal context that due process requires a pre-deprivation hearing before the revocation of parole.  *See id.* at *9 (citing *Young v. Harper*, 520 U.S. 143, 147–49 (1997)).  "The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions."  *Id.* (quoting *Morrissey v. Brewer*, 408 U.S. 471, 482 (1972)).  Parolees thus have a protected liberty interest in their "continued liberty."  *Id.* (citation omitted).  A number of district courts have extended this reasoning to the immigration context and held that once released from immigration custody, noncitizens acquire "a protectable liberty interest in remaining out of custody on bond."  *Diaz v. Kaiser*, No. 25-cv-5071, 2025 WL 1676854, at *2 (N.D. Cal. June 14, 2025) (collecting

---

[8] Courts have long considered as-applied due process challenges to other mandatory detention provisions of the INA and found noncitizens to possess a cognizable interest in their freedom from custody.  *See, e.g.*, *Gashaj v. Garcia*, 234 F. Supp. 2d 661, 666 (W.D. Tex. 2002) (finding permanent residents subject to mandatory detention due to a criminal conviction "have a fundamental right to a determination of whether their liberty interests should be impinged during the deportation process.").

cases); *accord M.S.L.*, 2025 WL 2430267, at *8 ("Just as people on preparole, parole, and probation status have a liberty interest, so too does [a noncitizen released from immigration detention] have a liberty interest in remaining out of custody on bond." (quoting *Ortega v. Bonnar*, 415 F. Supp. 3d 963, 969 (N.D. Cal. 2019)); *Rosado v. Figueroa*, No. 25-cv-2157, 2025 WL 2337099, at *12 (D. Ariz. Aug. 11, 2025) (same).

Because he spent nearly three years at liberty in the United States, Lopez-Arevelo possesses a cognizable interest in his freedom from detention.

### b.    Risk of Erroneous Deprivation

Under the second *Mathews* factor, the Court considers "whether the challenged procedure creates a risk of erroneous deprivation of individuals' private rights and the degree to which alternative procedures could ameliorate these risks."  *Martinez v. Noem*, 2025 WL 2598379, at *3 (quoting *Gunaydin v. Trump*, No. 25-cv-1151, 2025 WL 1459154, at *8 (D. Minn. May 21, 2025)).  As in other recent cases, at Lopez-Arevelo's bond hearing, "the IJ[] declined to exercise jurisdiction, finding that [the petitioner was] subject to mandatory detention under § 1225." *Espinoza*, 2025 WL 2581185, at *11.  Such a hearing "did not in fact provide . . . an opportunity to contest the existence, nature, or significance of [any] supervision violations" or otherwise make an individualized assessment of the need to re-detain him.  *See id.*  Certainly, Lopez-Arevelo has the right to appeal the IJ's jurisdictional dismissal to the BIA.  And he has done so. But given the BIA's interpretation of mandatory detention in *Yajure Hurtado*, that appeal is almost certainly a futile exercise.  Thus, there is a high risk that Lopez-Arevelo has been and will continue to be erroneously deprived of his liberty.

In terms of available alternatives and their probable benefits, agency decisionmakers regularly "conduct[] individualized custody determinations . . . consider[ing] flight risk and

dangerousness." *Velesaca v. Decker*, 458 F. Supp. 3d 224, 242 (S.D.N.Y. 2020) (citation

omitted); *see also* 8 C.F.R. §§ 236.1(c)(8), 1003.19(h)(3).  Because such a proceeding would

give Lopez-Arevelo the opportunity to be heard and receive a meaningful assessment of whether

he is dangerous or likely to abscond, it would greatly reduce the risk of an erroneous deprivation

of his liberty.  Therefore, the second *Mathews* factor also supports Lopez-Arevelo's claim that he

has been denied procedural due process.

### c.    Government's Interest

On the final factor, Respondents do not identify a countervailing interest, other than

perhaps their generalized interest in enforcing the INA as they interpret it.[9]  *See generally* Resp.

Of course, the Government has an interest in ensuring that noncitizens appear for their removal

hearings and do not pose a danger to the community.  But the decision to release Lopez-Arevelo

on his own recognizance three years ago, in and of itself, "reflects a determination by the

government that the noncitizen is not a danger to the community or a flight risk."  *Saravia v.*

*Sessions*, 280 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017), *aff'd* 905 F.3d 1137 (9th Cir. 2018).

And Lopez-Arevelo did not abscond from his proceedings—he appeared at the Miami

Immigration Court on the day of his arrest.  Nor is there anything in the record to indicate that he

has committed any crimes or endangered anyone during his three years at liberty in the United

---

[9] Respondents, in a footnote to their Response, sought "additional time to prepare and file a supplemental brief on the merits," in the event that the Court rejected their administrative exhaustion argument.  Resp. 9 n.4.  A request for leave to file supplemental briefing should be made in the form of a separate motion, not buried in a footnote.  In any event, the Court already extended Respondents' presumptive three-day response deadline to one week.  TRO 4 & n.1.  And Respondents had even more time to prepare for the September 8 Hearing, at which they presented additional merits arguments, such as their appeal to *Thuraissigiam*, which the Court has considered.  The Court does not find good cause to permit Respondents to file additional briefing, given that it would further prolong Lopez-Arevelo's detention.  Indeed, for similar reasons, the Court denied Lopez-Arevelo's own post-hearing request to file a supplemental brief.  Sept. 17, 2025, Order, ECF No. 25.

States.  In any event, if such concerns exist, they would be squarely addressed if the Court were to grant the petition and order a bond hearing.  *See Martinez v. Noem*, 2025 WL 2598379, at *4.

It is conceivable that the Government may assert an interest in avoiding "the incremental cost resulting from the increased number of hearings" if it must provide bond determinations to people like Lopez-Arevelo.  *Infinity Healthcare Servs., Inc. v. Azar*, 349 F. Supp. 3d 587, 601 (S.D. Tex. 2018) (quoting *Mathews*, 424 U.S. at 347).  But such costs cannot be terribly burdensome, given Respondents' concession that the Government conducted them for decades until its reinterpretation of the law earlier this year.  Sept. 8 Hr'g 14:02:57–14:03:23 ("[S]ince 1996 . . . DHS has allowed them to get a bond."); *accord Singh v. Andrews*, No. 25-cv-801, 2025 WL 1918679, at *8 (E.D. Cal. July 11, 2025) ("In immigration court, custody hearings are routine and impose a 'minimal' cost." (quoting *Doe v. Becerra*, --- F. Supp. 3d ----, 2025 WL 691664, at *6 (E.D. Cal. Mar. 3, 2025)).  Therefore, this factor also weighs in Lopez-Arevelo's favor.

Because all three *Mathews* factors support Lopez-Arevelo's position, the Court finds that detaining him without any individualized assessment of his flight risk and dangerousness deprives him of his constitutional right to procedural due process under the Fifth Amendment of the United States Constitution.  This decision is supported by a growing number of district courts across the country who have found that holding people like Lopez-Arevelo in mandatory detention without a bond hearing likely constitutes a due process violation.  *See, e.g.*, *Espinoza*, 2025 WL 2581185, at *11–12; *Kostak*, 2025 WL 2472136, at *3; *Singh*, 2025 WL 1918679, at *8–9 (collecting cases).

E.     **Scope of Relief**

As to the appropriate remedy, Petitioner requests that he be immediately released from custody.  Am. Pet. 21.  For their part, Respondents make the nebulous assertion that the appropriate remedy, if any, is "a redo of the process."  Resp. 9.

Some courts have determined that the appropriate relief for an immigration detainee held in violation of due process is the petitioner's immediate release from custody.  *See, e.g.*, *M.S.L.*, 2025 WL 2430267, at *15.  But it appears that the comfortable majority position—both historically and in recent weeks—is to instead require a bond hearing before an IJ.  *See, e.g.*, *Hernandez-Lara*, 10 F.4th at 46; *Velasco Lopez v. Decker*, 978 F.3d 842, 855 & n.14 (2d Cir. 2020); *Kostak*, 2025 WL 2472136, at  *4; *Maldonado*, 150 F. Supp. 3d at 811–12 (collecting cases).  This makes sense, given that the Court has found a *procedural* due process violation.  Lopez-Arevelo's rights are not violated by the very fact of his detention.  Rather, they are violated because he has been detained without a bond hearing that accords with due process.  *See* *Black*, 103 F.4th at 150–51 (considering "whether and when due process requires that a particular detained noncitizen receive a bond hearing").

When ordering a bond hearing as a habeas remedy, some courts place the burden of proof on the noncitizen seeking release.  *See, e.g.*, *Martinez v. Hott*, 527 F. Supp. 3d 824, 838 (E.D. Va. 2021).  This practice tracks the agency's own burden allocation at routine bond hearings.  *See id.* (citing 8 C.F.R. § 236.1(c)(8)); 8 C.F.R. § 1003.19(h)(3).  Yet, as of 2020, the "vast majority"—an "overwhelming consensus"—of courts granting immigration detainees' habeas petitions have placed the burden on the Government to prove by clear and convincing evidence that the detainee poses a danger or flight risk.  *Velasco Lopez*, 978 F.3d at 855 n.14 (citations omitted).  Allocating the burden in this manner reflects the concern that "[b]ecause the alien's

potential loss of liberty is so severe . . . he should not have to share the risk of error equally."
*German Santos*, 965 F.3d at 214 (citing *Guerrero-Sanchez v. Warden York Cty. Prison*, 905 F.3d
208, 224 & n.12 (3d Cir. 2018)).

And the consensus appears to be holding, with many courts in recent days ordering a
bond hearing, at which the Government bears the burden of justifying the immigration habeas
petitioner's continued detention by clear and convincing evidence. *See, e.g.*, *Velasquez Salazar
v. Dedos*, No. 25-cv-835, 2025 WL 2676729, at *9 (D.N.M. Sept. 17, 2025); *Morgan v. Oddo*,
No. 24-cv-221, 2025 WL 2653707, at *1 (W.D. Pa. Sept. 16, 2025); *J.M.P. v. Arteta*, No. 25-cv-
4987, 2025 WL 2614688, at *1 (S.D.N.Y. Sept. 10, 2025); *Espinoza*, 2025 WL 2581185, at *14;
*Arostegui-Maldonado v. Baltazar*, --- F. Supp. 3d ----, 2025 WL 2280357, at *12 (D. Colo. Aug.
8, 2025). Many courts have also found it appropriate to give the Government a short window in
which to complete the bond hearing, or else release the petitioner. *See, e.g.*, *Velasquez Salazar*,
2025 WL 2676729, at *9 (collecting cases). The Court finds these decisions persuasive,
especially given the IJ's conclusion that it lacks jurisdiction to hold a bond hearing for Lopez-
Arevelo. *See* IJ Bond Order. The Government is afforded one additional opportunity to do so,
but if it continues to disclaim the authority to conduct an individualized assessment of the
necessity of detaining Lopez-Arevelo in accordance with this Order, then he must be
immediately released.

## III.    CONCLUSION

For the foregoing reasons, the Amended Petition for Writ of Habeas Corpus, ECF No. 20,
is **GRANTED IN PART**. The Court **ORDERS** that, **<u>on or before September 29, 2025</u>**,
Respondents shall either: (1) provide Lopez-Arevelo with a bond hearing before an IJ, at which
the Government shall bear the burden of justifying, by clear and convincing evidence of

dangerousness or flight risk, Lopez-Arevelo's continued detention; or (2) release Lopez-Arevelo from custody, under reasonable conditions of supervision.

**IT IS FURTHER ORDERED** that, <u>**on or before September 29, 2025**</u>, Respondents shall **FILE** notice informing the Court whether Lopez-Arevelo has been released from custody. If Lopez-Arevelo has not been released from custody, Respondents shall inform the Court whether and when a bond hearing was held in accordance with the preceding paragraph. Respondents shall further inform the Court, in detail, of the reasons for the IJ's decision.

<u>**There will be no extensions of the September 29, 2025, deadlines**</u>.

**SO ORDERED**.

SIGNED this 21st day of September, 2025.

KATHLEEN CARDONE
UNITED STATES DISTRICT JUDGE